### IN THE UNITED STATES DISTRICT COURT FOR THE
### WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| VICKI LYNN SMITH, as Mother and personal representative of the Estate of JAMES THOMAS HOWARD, IV, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | NO. CIV-04-1271-HE |
| SEARS ROEBUCK AND CO., ET AL., | ) ) | |
| Defendants. | ) | |

### ORDER

In this case, plaintiff asserts claims against the defendants for strict products liability and negligence. Defendants have filed various motions with the court, including a motion in limine seeking to exclude the expert testimony of Gene Litwin and a motion for summary judgment. [Doc. Nos. 73, 74 and 75]. Plaintiff has responded in opposition to the motions. For the reasons which follow, the court concludes the expert testimony sought to be offered through Mr. Litwin does not meet the standards set forth in Fed. R. Evid. 702 and must therefore be excluded. Further, as the exclusion of such testimony results in the absence of evidence necessary to create an issue of material fact as to whether the product was defective, the court concludes defendants' motion for summary judgment should be granted.[1]

Facts[2]

---

[1]*In light of the court's disposition, defendants' motion to strike affidavit of Michael McGrew or, in the alternative, to disqualify Michael McGrew as trial counsel for plaintiff [Doc. # 89], motion for leave to file reply briefs [Doc. #90] and motion to strike affidavit and supplemental report of Gene Litwin [Doc. # 91] are **STRICKEN** as moot.*

[2]*The facts are recounted in a light most favorable to plaintiff and are, for the most part,*
*(continued...)*

In May of 1996, plaintiff purchased a home her parents had built in 1979. A garage door opener, purchased from defendant Sears Roebuck and Co. and manufactured in 1979 by defendant Chamberlain Group, Inc., was installed in the garage at the time the home was built. The opener was equipped with a mechanical reversing system which was activated by elevated motor torque and designed to reverse or stop the garage door if it encountered an obstruction. At the time the garage door opener in question was manufactured, the mechanical reverse system was the only type of technology utilized in the residential garage door opener industry.

Soon after moving into the home, the evidence indicates plaintiff had the garage door opener serviced because it was not operating. Walter Giblet, a service technician and owner of Southwest Overhead Garage Door ("Southwest"), concluded a safety switch had been inadvertently tripped which turned off the receiver. During the service call, Mr. Giblet re-set the "limits" on the door, "serviced and lubed" the door and operator and safety tested the system. Mr. Giblet instructed plaintiff to have her opener serviced and "lubed" once a year and placed a safety sticker on the wall of plaintiff's garage next to the wall-mounted control. This sticker warned that death or serious injury could result if a child was pinned underneath the garage door. It also warned to not let a child run or walk under the moving door or use the opener controls and to test the opener monthly to make sure it would "reverse on contact." The sticker referred plaintiff to the owner's manual but also directed her to test the

---

$^{2}$(...continued)
undisputed.

reverse mechanism by placing a one inch object (or 2x4 laid flat) on the floor. Plaintiff did not have the owner's manual for the garage door opener and never attempted to obtain a copy of such manual. She states she did, however, test the reverse mechanism on several occasions by placing a 2x4 on the floor.[3] She also "maintenanced" the door "maybe once a year" by lubricating the rollers and the chain with "WD-40" or "Liquid Wrench." Pl's. Dep. at 40.[4]

In November of 2000, plaintiff contacted Southwest because her garage door opener was not working. A service technician for Southwest fixed a faulty wire and "serviced and lubed and safety tested the opener."

On April 21, 2003, plaintiff's four-year old son Tommy was killed when he was pinned underneath the garage door. No one witnessed the accident. When plaintiff discovered Tommy laying face down underneath the door, he was not breathing. After being transported to the hospital, plaintiff's son was pronounced dead.

---

[3]*Plaintiff recalled testing the door "every other month or so." Pl's. Dep. at 62. When asked how many time she had tested the door between May of 1996 and April of 2003, she estimated "two dozen times." Pl's. Dep. at 41.*

[4]*Mr. Giblet testified that he tells his customers who want to maintain their doors themselves to "lube the rollers and hinges and springs" and the "rail and chain" that runs around the opener. Giblet Dep. at 50-51. The owner's manual for the garage door opener at issue recommended yearly lubrication of the "door rollers, bearings and hinges" but stated that the opener itself needed no lubrication. Pl.'s Ex. 11, p. 23.*

Deputy Sheriff Robert Franklin investigated the accident. When he attempted to "engage the auto-reverse feature" by grabbing the bottom of the garage door with his hands, he could not prevent the door from closing. Pl.'s Ex. 9.

On May 22, 2003, Mr. Giblet returned to plaintiff's home at her request to inspect the opener and the garage door. After running a failed safety test,[5] Mr. Giblet examined the opener's internal components. Upon inspection, he observed that "the capacitor had weeped a little bit on the opener and the motor smelled like it had been real hot." Giblet Dep. at 21. After "work[ing] the mechanism a little bit"[6] and "put[ting] a little bit of lubricant" on it, the garage door reversed off of the block. Id. at 21-22. Mr. Giblet told plaintiff that, in his opinion, any one or a combination of three things could have caused the opener to fail to reverse the garage door: (1) "the capacitor was bad, it was weeping and had been weeping;" (2) "the motor smelled bad, like the motor was going bad;" and (3) "everything was a little bit dry." Id. at 22, 35 and 60.

In December of 2003, plaintiff had Southwest replace her garage door opener. The original opener, minus its receiver,[7] was kept in plaintiff's garage for approximately six

---

[5]*Mr. Giblet testified that he placed a "block under the door and triggered the opener and [the door] shut down on the block and did not reverse." Giblet Dep. at 21.*

[6]*Mr. Giblet worked the mechanism by manually "torque[ing]" the motor and making sure it tripped the switch to engage the reverse mechanism. Giblet Dep. at 59.*

[7]*The receiver and various other parts have been lost.*

months and then kept in a shed owned by one of plaintiff's attorneys.[8]  Plaintiff filed this lawsuit in October of 2004.

Daubert[9] challenge

Plaintiff seeks to prove her products liability and negligence claims against the defendants through the expert testimony of Gene Litwin.  Mr. Litwin's opinion is that the garage door opener was defectively designed because its reverse mechanism could fail without warning.  More specifically, he opined that the opener "was prone to failure because in ordinary use [the reverse mechanism] would rarely be actuated and the mechanism would tend to get inoperably stuck when not actuated frequently."[10]  Litwin Report at 12.  Mr. Litwin never tested or ran the opener at issue.  He bases his opinion on the fact that the garage door reversed on a block after Mr. Giblet manually torqued and lubricated the opener's motor.  Id. at 5.  Mr. Litwin also opines that the opener was defectively designed because there was no backup safety mechanism and because the warnings in the manual were inadequate. Defendants claim Mr. Litwin is not qualified to offer such opinions and that his testimony is neither reliable nor relevant.

Rule 702 of the Federal Rules of Evidence provides:

---

[8]*In light of the court's disposition, defendants' allegations of spoliation of evidence need not be addressed.*

[9]*Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).*

[10]*Mr. Litwin explains that if the door meets an obstruction "which causes enough twisting of the motor, then there is a switch which is mechanically tripped."  Litwin's Report at 2.  When the switch is tripped, the door will reverse.  Id.*

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[11]

The rule sets forth the standard which proffered (and challenged) expert testimony must meet to be admissible and which the court must apply in performing its gatekeeping role in assessing scientific evidence. See Dodge v. Cotter Corp., 328 F.3d 1212, 1221-23 (10th Cir. 2003) (discussing the trial judge's gatekeeping role under Daubert).

As a part of its gatekeeping function and as a threshold matter, the court must determine whether the proposed expert is qualified to offer an opinion on the issues involved in the particular case. Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 969 (10th Cir. 2001). A qualified expert possesses the necessary knowledge, skill, experience, training or education relevant to the facts at issue. Id.

The record reflects that Mr. Litwin earned a Bachelor of Science in Engineering and a Masters in Philosophy of Science. He is not a licensed mechanical engineer and has never designed a garage door opener. He has taken some continuing education courses related to "human factors" in product safety and worked as a "Senior Consultant" for an engineering firm in the business of investigating industrial, construction and consumer accidents. He also co-authored a 1991 article entitled "Automatic Garage Door Child Entrapment Hazards"

---

[11] *The current version of Rule 702 substantially incorporates the principles set out in Daubert, which interpreted an earlier version of the rule.*

wherein the authors offered two design alternatives called the "safety foot" and "safety link" for use in residential garage openers. Since 1991, Mr. Litwin has been self-employed as a safety consultant "investigating accidents," "evaluating prototypes for manufacturers" and lecturing on "warning and product safety." Litwin C.V. at 2. He spends over 95% of his time acting as a litigation consultant.[12] In the last five years he has testified in over 77 cases and has been involved in a non-testifying capacity in many more. Litwin Dep. at 31-32.

While Mr. Litwin certainly has many of the attributes of an "expert for hire" rather than someone with independent credentials in the field of engineering, he nonetheless appears knowledgeable of and familiar with the various concepts and theories which appear pertinent to this case. Given these facts, the court concludes Mr. Litwin's qualifications and background are, in general, sufficient to qualify him to offer opinions in the area of product safety. Nevertheless, the court concludes that the opinions offered by Mr. Litwin, in the circumstances of this case, are not sufficiently reliable to be admissible.

Broadly stated, the Daubert standard reflected in Rule 702 requires that proffered evidence be both "reliable" and "relevant." Daubert, 509 U.S. at 589. "Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" Hollander v. Sandoz Pharms. Corp., 289 F.3d 1193, 1204 (10th Cir. 2002) (quoting Daubert, 509 U.S. at 592-93). That is, the testimony offered "must be based

---

[12]*As previously noted, among the factors weighed in applying Rule 702 is the question of whether the would-be expert's opinions are based on research or investigation outside the litigation or are derived purely for the purpose of testifying. See Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1317 (9th Cir. 1995) (cited in Fed. R. Evid. 702 advisory committee's note (2000)).*

on scientific knowledge, which 'implies a grounding in the methods and procedures of science' based on actual knowledge, not 'subjective belief or unsupported speculation.'" Dodge, 328 F.3d at 1222 (quoting Daubert, 509 U.S. at 590). "Relevance depends upon 'whether [that] reasoning or methodology properly can be applied to the facts in issue.'" Hollander, 289 F.3d at 1204 (quoting Daubert, 509 U.S. at 593).

In making its reliability determination, the Court may assess several non-exclusive factors including: (1) whether the expert's theory or technique can be or has been tested for reliability; (2) whether the expert's theory or technique has been subjected to publication or peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community. Truck Ins. Exch. v. Magnetek, Inc., 360 F.3d 1206, 1210 (10th Cir. 2004). Courts have also considered whether the proffered opinion has been developed expressly for purposes of testifying, whether the expert has been as careful in forming his opinion for his paid litigation work as he is in his regular profession, whether the expert has adequately accounted for obvious alternative explanations, and whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. See Fed. R. Evid. 702 advisory committee's note (2000), and cases cited therein. While the plaintiff "need not prove that the expert is undisputably correct or that the expert's theory is generally accepted in the scientific community . . . [she] must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability

requirement." Truck Ins. Exch., 360 F.3d at 1210 (internal quotations and citations omitted).

Mr. Litwin opines that the mechanical opener at issue, and others like it, are defective because they are prone to fail without warning. With respect to mechanical devices in general, Mr. Litwin acknowledges they do not last forever and are subject to failure without warning. With respect to the opener in this case, he acknowledges that the motor was old and worn and that the capacitor was weeping.[13] However, he dismisses these facts as causing or even contributing to the failure of the reverse mechanism and instead concludes, based on the actions of Mr. Giblet in torqueing and lubricating the motor, that the reverse mechanism was defectively designed because it got stuck through inactivity over time. This conclusion, which is not based on testing of the opener itself or any opener like it, fails to take into account plaintiff's testimony that she tested the mechanism on a regular and consistent basis. His opinion also does not adequately account for other alternative reasons for the system's failure, such as incorrect lubrication of the components, either too much or too little, throughout the opener's 24 years of use, inappropriate settings or adjustments in the intervening years since its installation,[14] and the possibility that the failure to reverse was

---

[13] When asked what kinds of things can cause a capacitor to weep, Mr. Litwin admitted that was outside his expertise but stated that weeping could occur "with really older capacitors." Litwin Dep. at 264.

[14] Mr. Litwin states in his own article that the performance of garage doors is "significantly affected by installation and maintenance variables." Def's. Ex. H.

caused by an old and worn motor with insufficient torque to trip the reverse mechanism.[15]

While the reverse mechanism in this case did fail, there is no adequate foundation in Mr. Litwin's report for the conclusion that a design defect, as opposed to other possible factors, actually caused the failure. As a result, his testimony is not sufficiently reliable as applied to the facts of this case.[16]  See, e.g., Mitchell v. Gencorp Inc., 165 F.3d 778, 781 (10th Cir. 1999) ("[An] expert's assurance that the methodology and supporting data is reliable will not suffice.").

Mr. Litwin also seeks to offer testimony regarding the inadequacy of the warnings provided in the owner's manual for the garage door opener. Under Oklahoma law, "the failure to adequately warn of a known potential risk renders a product defective, however, the plaintiff must establish that the failure to warn caused the injury." Daniel v. Ben E. Keith Co., 97 F.3d 1329, 1332 (10th Cir. 1996) (internal citations omitted). In this case, there is no dispute that plaintiff never read the owner's manual for the opener. Thus, any testimony regarding the inadequacy of the warnings in the owner's manual is irrelevant and inadmissible. See, e.g., Daniel, 97 F.3d at 1332-33 (presumption under Oklahoma law that

---

[15] *Mr. Litwin's own explanation is that the reverse mechanism is tripped through increased motor torque.*

[16] *Mr. Litwin also opines that the opener could have been safer if it had been equipped with a backup safety device. However, "the fact that it is possible to make a product more safe does not render its design defective." Wheeler v. HO Sports, Inc., 232 F.3d 754, 758 (10th Cir. 2000) (internal quotations omitted). See Gaines-Tabb v. ICI Explosives, Usa, Inc., 160 F.3d 613, 624 (10th Cir. 1998) ("Only when a defect in the product renders it less safe than expected by the ordinary consumer will the manufacturer be held responsible.") (quoting Lamke v. Futorian Corp., 709 P.2d 684, 686 (Okla. 1985)).*

a person read and heeded the warnings on a product disappeared when evidence indicated that person never looked at warning label). See also Wheeler, 232 F.3d at 758-59 (question of fact existed as to whether warning, which had been read and discussed by plaintiff, adequately warned of drowning danger).

Based on the above, the court concludes Mr. Litwin's testimony is neither sufficiently reliable nor, as to the issue of the adequacy of the warnings, relevant under the standards of Rule 702 and must be excluded. Accordingly, defendants' motion to exclude the testimony of Mr. Litwin is **GRANTED**.

Motion for Summary Judgment

Defendants have moved for summary judgment on plaintiff's products liability and negligence claims.[17] Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When applying this standard, the court "view[s] the evidence and draw[s] all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Martin v. Kansas, 190 F.3d 1120, 1129 (10th Cir. 1999), overruled on other grounds by Bd. of Trustees of Univ. of Ala. v. Garrett,

---

[17]*As part of their summary judgment motion, defendants argue plaintiff's claims are barred by Oklahoma's ten year statute of repose found in 12 Okla. Stat. § 109. Section 109 " limits liability for persons or entities involved in the design or construction of improvements to real property." Durham v. Herbert Olbrich GMBH & Co. KG, 404 F.3d 1249, 1250 (10th Cir. 2005). However, "mere manufacturers" such as defendant Chamberlain are not protected by § 109. Id. at 1254. Thus, defendants' argument in this regard is without merit.*

11

531 U.S. 356 (2001).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Martin, 190 F.3d at 1129.

In order to prevail on her products liability claim, plaintiff must establish the following elements under Oklahoma law: (1) a defect existed in the product at the time it left the manufacturer or seller's control; (2) the defect made the product unreasonably dangerous; and (3) the defect in the product was the cause of the injury.  Black v. M & W Gear Co., 269 F.3d 1220, 1231 (10th Cir. 2001).  See Johnson v. Ford Motor Co., 45 P.3d 86, 91 n.12 (Okla. 2002) ("To maintain a cause of action under manufacturers' products liability, the plaintiff must prove the product was the cause of the injury, that the product was defective when it left the control of the manufacturer, and that the defect made the product unreasonably dangerous to an extent beyond which would be contemplated by the ordinary consumer who purchases it.").  "It is not enough to merely contend that a defect existed, show that an accident occurred, and assume the two are necessarily related."  Beverly v. Wal-Mart Stores, Inc., 3 P.3d 163, 167 (Okla. Ct. App. 1999) (internal quotations and citations omitted).  "[I]njury, of itself, is not proof of a defect and raises no presumption of defectiveness."  Gates v. Ford Motor Co., 494 F.2d 458, 459 (10th Cir. 1974).  Instead, in order to survive summary judgment a plaintiff must provide sufficient evidentiary material which raises a reasonable inference from which the fact finder may rationally conclude that the plaintiff's injuries "proximately resulted from the product's failure of performance causally related to its defective condition."  Kaye v. Ronson Consumer Prods. Corp., 921

12

P.2d 1300, 1302 (Okla. Ct. App. 1996).

Absent the now excluded testimony of Mr. Litwin, plaintiff offers no evidence which would permit a rational trier of fact to conclude that the accident which occurred in this case was the result of a defectively designed opener. See, e.g., Stuckey v. Young Exploration Co., 586 P.2d 726, 731 (Okla. 1978) ("The fact that a part wears out after 186,000 miles does not evidence that a defect existed when the truck left the manufacturer."). As a result, summary judgment is **GRANTED** in favor of defendants on plaintiff's products liability claim.

Plaintiff's negligence claim based on a post-sale duty to warn of a defect also fails for lack of proof. In order to prevail on this claim, plaintiff must show that the defendants breached a duty of care which caused her harm. See Comer v. Preferred Risk Mut. Ins. Co., 991 P.2d 1006, 1010 (Okla. 1999) ("A party seeking to establish negligence must prove by a preponderance of evidence the existence of a duty owed by the defendant to the plaintiff to use ordinary care, a breach of that duty, and an injury proximately caused by the defendant's breach of duty."). Plaintiff alleges that the defendants had a duty to warn prior customers about the opener's defective design. In addition to the absence of proof that a design defect existed, the court concludes Oklahoma does not recognize a post-sale duty to warn. Under Oklahoma law, the determination of whether a product is unreasonably dangerous due to a defective design is measured by consumer expectations *at the time the product leaves the manufacturer's control*. Lee v. Volkswagen of Am., Inc., 688 P.2d 1283,

1285 (Okla. 1984); Kirkland, 521 P.2d 1353, 1366 (Okla. 1974).[18]  See also Wicker v. Ford Motor Co., 393 F.Supp.2d 1229, 1236 (W.D. Okla. 2005) ("Oklahoma does not recognize a post-sale duty to warn or retrofit a product.").  As such, defendants' motion for summary judgment on plaintiff's negligence claim is **GRANTED**.

This case arises out of circumstances which are horrible and tragic.  No one can be without sympathy for the boy who died and the family that survives him.  However, for the reasons set forth above, the court concludes plaintiff's claims do not afford a basis for imposing responsibility for this tragic accident on defendants.

**IT IS SO ORDERED**.

Dated this 17th day of March, 2006.

JOE HEATON
UNITED STATES DISTRICT JUDGE

---

[18]*Plaintiff's reliance on McKee v. Moore, 648 P.2d 21, 23-24 (Okla. 1982), is misplaced as that case dealt with the manufacturer of a pharmaceutical product and its continuing duty to warn of the adverse side effects of its product.*